IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| JUSTIN ALAN QUINLAN, | Cause No. CV 21-108-BLG-SPW |
| Petitioner, | |
| vs. | ORDER |
| PETER BLUDWORTH, WARDEN CROSSROADS CORRECTIONAL CENTER; ATTORNEY GENERAL OF THE STATE OF MONTANA, | |
| Respondents. | |

On October 20, 2021, state pro se petitioner Justin Alan Quinlan filed a petition under 28 U.S.C. § 2254, and exhibits in support, seeking habeas corpus relief. (Docs. 1 & 1-1.) On January 31, 2022, this Court directed Quinlan to show cause as to why the majority of his claims should not be dismissed as procedurally defaulted. (Doc. 3.) Quinlan responded. (Doc. 7.)

On September 2, 2022, Magistrate Judge Cavan recommended that Claims 3-32 should be denied and dismissed as procedurally defaulted and/or non-cognizable in federal habeas. (Doc. 13.) On November 17, 2022, Quinlan filed an objection to Judge Cavan's Findings and Recommendations. (Doc. 17.) The Findings and Recommendations were subsequently adopted in full. (Doc. 18.)

Quinlan has filed a motion asking this Court to reconsider its Order adopting

1

the Findings and Recommendations. (Doc. 19.) Also, pending before the Court

are the two claims remaining in Quinlan's original petition. Each issue will be

addressed in turn.

## I.    Motion for Reconsideration

In his motion for reconsideration, Quinlan takes issue with this Court's

finding that Claims 8, 9, and 10 were procedurally defaulted. (See Doc. 19.)

Quinlan asserts that these three claims were presented in his direct appeal and,

accordingly, should be addressed on the merits by this Court, in the same manner

as Claims 1 and 2. (*Id.*) In support of his contention, Quinlan cites to various

portions of his opening brief filed on direct appeal where reference is made to each

claim. (*Id.*)

But the citations Quinlan makes to the appellate record are from the

"Statement of Facts" section of his brief.[1] For example, in his motion Quinlan

refers to Claim 8, regarding the prosecutor unjustly leading the witness, and notes

that this claim was contained in page 17 of his appellate brief. (*Id.*) This section

of his brief contains the following summary:

> S.Q.'s direct examination was evasive, non-responsive, and full of
> inconsistencies. (Combined Tr. at 364-65 (trial court acknowledging this
> fact).) S.Q. frequently paused for more than 30 seconds at a time and
> refused to answer questions or claimed she did not remember. (See
> Combined Tr. At 502-556.) The district court allowed the State to resort to
> leading questions to elicit anything from S.Q. (See Combined Tr. at 502-

---

[1] A copy of Quinlan's opening brief has been filed in this Court's record. (*See* Doc. 16-14.)

556.)

(Doc. 16-14 at 23.)  Quinlan makes similar references to the Statement of Facts section of his appellate brief in relation to Claims 9 and 10.  (*See generally* Doc. 19.)

Prisoners are required to give the state courts a full and fair opportunity to review alleged constitutional errors before this Court may review the claims in federal habeas.  This requires a prisoner to fairly present all claims by providing the factual and legal basis for their claims in a procedurally appropriate manner.  In order to satisfy this fair presentation requirement, a prisoner must present the state court with a description of the facts and specific legal bases for each federal claim. *See Picard v. Connor*, 404 U.S. 270 (1971). While Quinlan may have made passing reference to the factual basis underlying these claims, he did not present the substance of these discrete claims to the Montana Supreme Court.

As discussed further below, the claims that Quinlan actually presented on direct appeal were (1) the trial court erred in its evidentiary rulings, and (2) as a result of the evidentiary rulings, the trial court violated Quinlan's right to confrontation and to present a complete defense.  (*See* Doc. 16-14 at 33-53.)  Thus, despite Quinlan's claim to the contrary, Claims 8, 9, and 10 were never fairly presented to the state courts in his direct appeal.

"[A] motion for reconsideration should not be granted, absent highly unusual

3

circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F. 3d 873, 880 (9th Cir. 2009). Quinlan makes no such showing. His motion for reconsideration provides no basis to support a finding that claims 8, 9, and 10 are not procedurally defaulted. Accordingly, this Court's prior finding will remain undisturbed. Quinlan's motion for reconsideration will be denied.

## II.    Claims 1 & 2

### A. Factual Background

Following a jury trial in August of 2018, a Rosebud County jury found Quinlan guilty of Incest. Quinlan was sentenced to the Montana State Prison for a term of 100-years, with seventy-five years suspended.

The following facts are taken directly from the Montana Supreme Court's decision affirming Quinlan's conviction:

> Justin and Heather Quinlan met as teenagers and were engaged in a relationship for over twenty years. The Quinlans lived in the unincorporated town of Rosebud, Montana, in Rosebud County, and had three children: A.Q., S.Q., and Q.Q. Although he provided for his family, Justin Quinlan (Quinlan) was not usually attentive to his children. When not working, Quinlan typically repaired derby cars. Quinlan and Heather fought extensively in the children's presence, primarily about Quinlan's serial infidelity, about which the children were aware. In 2014, A.Q. and S.Q. witnessed Quinlan engaging in relations with another woman. Heather was seven months pregnant with Q.Q. at the time.
>
> Following a referral from S.Q.'s school, Patti Fitterer and Sway Gutierez, a

4

behavioral intervention specialist and licensed social worker, respectively, with the Eastern Montana Community Mental Health Center, counseled S.Q. on social and organizational skills, from April 2015 to May 2016. S.Q. confided to them her frustration over Quinlan's infidelity and her desire to spend more time with him.

In the early days of August 2016, Heather went to Spokane, Washington to care for her ailing father. Anticipating being gone for multiple weeks, Heather left S.Q., then 11 years old, in the care of Misty Zweifel, the mother of one of S.Q.'s friends, during the weekends. S.Q. returned home on weekdays to stay with Quinlan and A.Q., her older brother. On Sunday, August 14, Quinlan took S.Q. fishing and she proudly caught a catfish. On August 15, Quinlan and S.Q. travelled to Miles City to purchase supplies, and stayed with Quinlan's mother, Theresa Williams, that night. While Quinlan was at work the next day, S.Q. went to the home of her friend, A.A., to play for the afternoon. Just before suppertime, S.Q. made her first statement regarding Quinlan, telling A.A., while shaking and tearing up, that her father was practicing "sex ed" on her. A.A. relayed this information to her mother, Shanda Anderson, who spoke with S.Q. about her statement. S.Q. provided few details, but Anderson testified that S.Q. was crying and shaking, and Anderson contacted Heather in Spokane. Heather was initially skeptical of S.Q.'s assertions and, after speaking to Anderson and S.Q. on the phone, directed her mother-in-law, Williams, to pick up S.Q. from the Anderson home. Heather notified Quinlan of S.Q.'s statement.

Williams immediately took S.Q. to the emergency room at the Rosebud Health Center. On the way, S.Q. said only, "I'm sorry grandma." Lorraine Ackerman, a nurse practitioner, interviewed S.Q. and performed a physical exam. S.Q. told Ackerman that Quinlan tried to have sex with her a few days ago and provided details of several sexual encounters with Quinlan. Ackerman examined S.Q., finding no trauma, and she reported the incident to the Department of Public Health and Human Services (Department).

Jennifer Winkley, a Child Protection Supervisor for the Department, received Ackerman's report and assigned the case to Sheana Rose, a Child Protection Specialist. Winkley conveyed the allegations to Rosebud County Sheriff Allen Fulton, who, with the consent of both Heather and Quinlan, conducted a forensic interview of S.Q. Officer Bridger Wren of the Sheriff's Department and Rose observed the interview in an adjacent room. Providing a rough narrative, S.Q. described three or four incidents that happened

"around last week." Specifically, she told Winkley that Quinlan put his "bad spot" in her "bad spot" and that "it happened mostly in the butt," and described Quinlan making her get down on her hands and knees. S.Q. said she did not want her dad to go to jail. After the interview, the Department put a protection plan in place that prohibited Quinlan from having contact with S.Q.

Later that afternoon, Fulton and Wren contacted Quinlan, who agreed to an interview. Quinlan did not admit to the allegations, but stated that if they had happened, he did not remember them, and thus he must have been sleeping. Quinlan consented to a search of his home, and Wren collected a bedsheet, blanket, and two pairs of Quinlan's underwear as evidence. Rose interviewed S.Q.'s family members and, learning that many of them did not believe her accusations, determined the best course of action was to place S.Q. into voluntary foster care to protect her from future psychological harm. After Rose received reluctant consent from Heather, the Department placed S.Q. with Robin and Kyle Wolff in Miles City. Q.Q. was placed with them a few days later. While there, S.Q. craved attention and repeatedly expressed frustration about her parents' relationship. The Department required the Wolffs to complete reports about S.Q.'s behavior, including her truthfulness.

S.Q. was subsequently examined by Abbey Burger, a board-certified obstetrician-gynecologist, in Billings, and underwent a second forensic interview with Jace Beckett of the Rosebud County Sheriff's Office. Both times she described three discrete incidents with Quinlan, with varying detail, sometimes stating, "I don't remember" or "I'm trying to keep my mind off of it." Burger's examination produced no physical findings of sexual assault.

In June of 2017, S.Q.'s foster mother, Robin, delivered to the Department a letter written by S.Q. recanting her allegations against Quinlan. During a session with her then-counselor, Pam Colombik, S.Q. explained she wrote the letter because she was upset with her foster parents and wanted to go home. The Department has no record of the letter, and its location is unknown. The following month, in July 2017, Colombik assisted S.Q. in constructing a trauma narrative recounting the events, and S.Q. shared the narrative with Heather. In August of 2017, the Rosebud County Attorney filed an Information alleging Quinlan committed Incest, "[o]n or about August 2 through 16, 2016."

The State moved the District Court in limine to prohibit Quinlan from introducing "evidence, questions or statements related to ... alleged lies told by [S.Q.] without obtaining prior permission" from the court. The State expressed concern that Quinlan would inappropriately use character evidence to portray S.Q. as a "bad kid." Quinlan countered by arguing he should be allowed to confront S.Q. during cross-examination to challenge her credibility and veracity. The District Court reserved ruling on the admissibility of the evidence until trial, and required Quinlan to first obtain leave from the court to mention "alleged prior bad conduct or alleged lies" by S.Q., outside the presence of the jury.

In her trial testimony, S.Q. regularly provided simple one-word answers or remained unresponsive for multiple minutes to questions surrounding the allegations and her parents, especially their tumultuous relationship. The District Court eventually permitted the prosecution to ask leading questions to elicit testimony from her. S.Q. spoke about four instances of abuse. The first occurred while S.Q. was sitting on Quinlan's lap watching television. Quinlan took off S.Q.'s clothes and touched her. The second occurred the following day in Quinlan's bedroom. The third again occurred in Quinlan's bedroom, when Quinlan took off S.Q.'s clothing and had her lay down. The fourth occurred in Quinlan's bedroom, when Quinlan had S.Q. get on her hands and knees and lay down in various positions. Except for the first instance, S.Q. testified that Quinlan touched her butt and "bad spot" with Quinlan's "male part." S.Q. was inconsistent on whether A.Q. was home during the incidents, but ultimately settled on the opinion that A.Q. was home during every incident.

At a break in S.Q.'s testimony, the District Court addressed the reserved evidentiary issues outside the presence of the jury. The State expressed concern that the defense was improperly attempting to introduce extrinsic evidence of specific instances of conduct, i.e., lying, to impeach her credibility. The defense argued it was entitled to introduce evidence of S.Q.'s untruthfulness, and the court inquired, "so tell me exactly which lies do you want to delve into." Defense counsel explained:

MS. HARADA: She lied to Robin and Kyle about stealing at school. She lied to Robin and Kyle about getting in trouble for bullying on the school bus. She lied to Robin and Kyle about using the F word at school. She lied about Kyle smacking her. She lied about downloading Instagram. Those are

7

the main lies I'd like to get into.

...

MS. HARADA: Well also she told her – I think she told her social worker that Kyle had smacked her.

THE COURT: So your inquiry would be limited – limited to whether she lied about those incidences?

MS. HARADA: Yes.

...

MS. HARADA: Not whether she actually did those things but whether she lied about them.

...

MS. HARADA: I'm not trying to emphasize the conduct I'm trying to emphasize the lie.

The District Court ruled:

THE COURT: Well I'm going to allow the inquiry into the truthfulness of these instances that you have [ ] indicated you've wished to inquire in under the care of Robin and Kyle. As far as extrinsic evidence, I am only going to allow you to inquire into the evidence of truthfulness or untruthfulness with regard to say Robin and Kyle so you can inquire into that kind of general statement, whether they believe she was truthful or untruthful. I'm not going to allow inquiry into those specific instances.

...

THE COURT: You can inquire into Robin and Kyle about her reputation for truthfulness you ...

MS. HARADA: Just generally?

THE COURT: Generally, alright? That's the ruling of the Court. I agree with the State. I believe these are subsequent happenings. They are after the fact. They are sometime two (2) years after the fact [,] I believe [,] that's why I'm limiting it.

...

THE COURT: The relevance is somewhat limited. I think that there is [ ] a problem with unfair prejudice so I'm going to limit it however to character for truthfulness. So you can inquire under cross examination, you can inquire if there's a [ ] denial of Robin and Kyle regarding [ ] character for truthfulness or untruthfulness but I want it limited to that, okay?

On cross-examination of S.Q., defense counsel asked S.Q. whether she lied in the five specific circumstances. S.Q. answered each question with either "yes" or "no" responses. Further, defense counsel questioned witnesses

regarding S.Q.'s truthfulness, including Heather, A.Q., Rose, Williams, Gutierez, Wolff, and A.A.

## B. Quinlan's Claims

1. The State's interpretation and reading of Mont. R. Evid 608 is incorrect. The State is conflating Fed. R. Evid. 608(b) with Mont. R. Evid. 608(b) and because Quinlan was tried in state court, the federal rules of evidence should not apply. (Doc. 1 at 4, ₧ 13A.)

2. The trial court violated Quinlan's constitutional right to present a complete defense when it prevented him from challenging S.Q.'s untruthful response on cross-examination with extrinsic evidence from other witnesses. (*Id.* at 5, ₧ 13B.)

## C. Standard of Review

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a district court may not grant habeas relief unless the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *Id.* § 2254(d); *see also Williams v. Taylor*, 529 U.S. 362, 412 (2000). Additionally, a federal habeas court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and

9

convincing evidence.  28 U.S.C. § 2254(e)(1).

The U.S. Supreme Court further instructs that § 2254(d)(1) consists of two separate clauses. "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached [by the U.S. Supreme Court] on a question of law or if the state court decides a case differently than the Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the U.S. Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. A federal court may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.  The question is whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

Thus, AEDPA sets forth a highly deferential standard for evaluating state court decisions.  A state prisoner is required to "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103

(2011).

### D. Analysis

### Claim 1: Due Process Violation via Application of Evidentiary Rules

Quinlan argues the state erred by interpreting M.R. Evid. 608(b) in the same manner as Fed. R. Evid. 608(b).  He states because he was not tried in federal court, the federal rules of evidence had no application to him.  (Doc. 1 at 4, ₱ 13(A).)  Quinlan believes the trial courts erroneous rulings relative to Rules 608(b) and 613 were detrimental to his ability to prove his case and defend himself.  *Id.* Quinlan asserts his Fifth and Fourteenth Amendment due process rights were violated.  *Id.*  The Montana Supreme Court rejected this claim on the merits.  As set forth below, Quinlan has failed to demonstrate constitutional error and the claim is not cognizable in federal habeas.

### i.   Background

On appeal, Quinlan argued that the trial court erred when it prevented him from presenting extrinsic evidence of specific instances in which S.Q. lied to challenge her credibility.  Specifically, Quinlan asserted he should have been able to inquire into specific instances of conduct on cross-examination concerning S.Q.'s character for untruthfulness.  He argued his defense was prejudiced by the court's prohibition and, accordingly, was prevented from demonstrating S.Q.'s bias or motive to testify falsely.  *State v. Quinlan*, 403 Mont. 91, ₱ 18, 479 P. 3d 982,

11

2021 MT 15.

The Court began addressing Quinlan's argument by discussing the applicable rules of evidence, including M.R.Evid. 608(b), which provides: "[s]pecific instances of conduct of a witness, for the purpose of attacking or supporting the witness' credibility, may not be proved by extrinsic evidence," but they may, "in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness [ ] concerning the witness' character for truthfulness or untruthfulness." *Id.* at ¶ 19. The Court noted that the five purported lies told by S.Q. which Quinlan wished to probe, constituted "specific instances of prior conduct probative of [S.Q.'s] character for untruthfulness," and accordingly M.R. Evid. 608(b) forbid proof of the instances by extrinsic evidence, but inquiry could by allowed on cross-examination, subject to "the discretion of the court." *Id.* (citations omitted).

The Court observed the trial court's concerns about the relevance of each instance of purported lying and the potential for unfair prejudice, as well as the fact that each instance occurred well after S.Q. had accused Quinlan of incest. *Id.* at ¶ 21. The trial court was concerned with the potential for unfair prejudice. The Montana Supreme Court determined these considerations were within the broad discretion of the lower court. The trial court permitted Quinlan to inquire about each of the five instances on cross-examination and also allowed Quinlan to

12

inquire generally of other witnesses regarding S.Q.'s character for untruthfulness, but did not permit Quinlan to question other witnesses about the specific five instances. *Id.*

The Court found Quinlan's argument that he should have been able to challenge S.Q.'s response on cross examination with extrinsic evidence of her lies contradicted the text of Rule 608(b). *Id.* at ¶ 23 (citing Rule 608 "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, may not be proved by extrinsic evidence.") The Court noted that the trial court had the authority to allow Quinlan to conduct a more extensive inquiry regarding the incidents, but that the limited inquiry it fashioned based upon relevance and prejudice concerns was proper. *Id.* at ¶ 24.

Finally, the Court disagreed with Quinlan's assertion that he should have been allowed to offer extrinsic evidence of S.Q.'s lies under M.R. Evid. 613(b) as a prior inconsistent statement. The Court found Quinlan improperly equated a prior inconsistent statement with a prior lie and in so doing, misapplied the rule. *Id.* at ¶ 25. S.Q. did not testify to any of the five lying instances in her trial testimony. If she had, Rule 613(b) would have allowed Quinlan to inquire into her prior inconsistent statements regarding those inconsistencies. Instead, S.Q. testified that she had not lied or could not remember the incidents, accordingly, the testimony did not provide a foundation for introducing extrinsic evidence regarding each

13

instance to establish them as "prior inconsistent statements." *Id.* The Court determined the trial court did not misapply the evidentiary rules or abuse its discretion in ruling upon the admissibility of the evidence. *Id.* at ¶ 26.

### ii. Federal violation

A state prisoner is entitled to federal habeas corpus relief only if he is held in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); *see also Estelle v. McGuire*, 502 U.S. 62, 67-8 (1991). Unless an issue of federal constitutional or statutory law is implicated by the facts presented, the claim is not cognizable in federal habeas corpus. *Estelle*, 502 U.S. at 68. Alleged errors in the interpretation or application of state law do not warrant habeas relief. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Hubbart v. Knapp*, 379 F. 3d 773, 779-80 (9th Cir. 2004).

Quinlan's claim is somewhat confusing. He asserts the state court erred by applying federal evidentiary rules to his case, and not the state rules. As set forth above, however, the Montana Supreme Court discussed the application of the Montana Rules of Evidence. While the Court did reference a Ninth Circuit case analyzing Fed. R. Evid. 608(b), *United States v. Brooke*, 4 F. 3d 1480 (1993), it was done to provide additional clarification regarding the rule's prohibition on use of extrinsic evidence. *Quinlan*, 403 Mont. 91, at ¶ 23. Moreover, while M. R. Evid. 608 and Fed. R. Evid. 608 are not identical, they are similar in both form and

14

substance.

It matters not, however, because a challenge to a state evidentiary ruling does not involve a deprivation of a federal constitutional right and, therefore, is not cognizable in a federal habeas petition. *Estelle*, 502 U.S. at 67-8; *Rhoades v. Henry*, 638 F. 3d 1027, 1034, n. 5 (9th Cir. 2011) ("[E]videntiary rulings based on state law cannot form an independent basis for habeas relief"). Accordingly, to the extent that Quinlan claims the state courts misapplied the Montana Rules of Evidence, either Rule 608(b) or Rule 613, the claim is not cognizable in federal habeas.

"It is well settled that a state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process. *Spivey v. Rocha*, 194 F. 3d 971, 977-78 (9th Cir. 1999). The Supreme Court has "long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984). Although state courts have broad constitutional latitude in rulings regarding the exclusion of evidence from criminal trials, due process is abridged if a defendant is prevented from introducing important evidence by rules which "infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." *Holmes v. South Carolina*, 547 U.S. 319

(2006).

As discussed more fully below, Quinlan's right to present a complete defense was not violated. In this case Quinlan cannot show that the trial court's application of the evidentiary rules violated his due process rights. The Montana Supreme Court reasonably determined that the trial court properly applied the text of Rule 608. There was nothing arbitrary or disproportionate about the decision. Further, the trial court's decision to limit the scope of Quinlan's questioning of S.Q. on cross-examination, relative to the purported five instances of her lying, was based on valid concerns surrounding relevance and prejudice. Specifically, several of the instances were remote in time and had limited relevance. In short, Quinlan has not established that the state court's evidentiary ruling rendered his trial "fundamentally unfair." Thus, Quinlan fails to assert a federal due process claim. The Montana Supreme Court's decision upholding the challenged evidentiary ruling was not contrary to, or an unreasonable application of, clearly established federal law. This claim will be denied.

### Claim 2: Violation of Quinlan's Right to Present a Defense

Quinlan claims the trial court violated his right to present a complete defense when it prevented him from challenging S.Q.'s untruthful responses on cross-examination with extrinsic evidence and allowing inquiries from the remaining witnesses about the specific instances of untruthfulness. (Doc. 1 at 5, ¶ 13(B)). He

claims his 5th, 6th, and 14th Amendment rights were violated and that the Court erred in finding there was no Confrontation Clause violation. *Id.*  This Court disagrees.

### i.    Background

The Court began analyzing Quinlan's claim by observing "Persons accused of a crime hold a fundamental right to be confronted by witnesses against them." *Quinlan*, 403 Mont. 91,  ₱ 29, citing U.S. Const. amnd. VI; Mont. Const. art. II, § 24.  The Court also observed, "though a defendant's right to confront and cross-examine an adverse witness is grounded in the Sixth Amendment to the United States Constitution, and Article II, Section 24 of the Montana Constitution, a trial court has broad discretion to limit the scope of cross-examination to those issues it determines are relevant to the trial." *Id.* at ₱ 30 (citations omitted).

The Court found Quinlan was provided with the "hallmark elements" of his right to confront S.Q., including S.Q.'s physical presence at trial, her testimony under oath, cross-examination of S.Q., and observation of S.Q.'s demeanor by the trier of fact. *Id.* at ₱ 31.  Quinlan's cross-examination of S.Q. was extensive and included topics such as: the letter S.Q. wrote recanting her allegations against Quinlan, the strained relationship between her parents, S.Q.'s knowledge of Quinlan's infidelity, and her frustrations with Quinlan. *Id.*  Based upon relevancy and prejudice considerations discussed above, the trial court placed parameters

upon Quinlan's questioning of S.Q. regarding the five instances of lying, as well as his questioning of other witnesses about S.Q.'s character for truthfulness. The Court noted the instances of which Quinlan sought to inquire were "largely childish untruths that bore no demonstrated relation to S.Q.'s allegations against her relationship with Quinlan." *Id.* Accordingly, the Court concluded Quinlan was afforded the constitutionally required threshold level of inquiry and exercised its discretion properly by imposing limits on Quinlan's evidentiary inquiry.

## ii.   Federal Violation

"[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense," *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)(*quoting Trombetta*, 467 U.S. at 485), but the Supreme Court has also recognized that "state and federal rule makers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. *Holmes*, 547 U.S. at 324.

In *Nevada v. Jackson*, 569 U.S. 505 (2013), the Court observed "[o]nly rarely" had it held that "the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." *Id.* at 569 U.S. at 509. Further, the Court noted that it had never held that the "Confrontation Clause entitles a criminal defendant to introduce extrinsic evidence for impeachment purposes." *Id.* at 512. Thus, to the extent that Quinlan attempts to argue his right

18

to a complete defense was violated by the state court preventing him from impeaching S.Q.'s credibility via extrinsic evidence, the claim must fail. That is, he cannot demonstrate that the Montana Supreme Court's decision was contrary to clearly established federal law, see 28 U.S.C. § 2254(d), because he had no federal right to impeach S.Q. via extrinsic evidence.

Additionally, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective whatever way, and to whatever extent, the defense might wish." *Delaware v. Fernsterer*, 474 U.S. 15, 20 (1985)(per curiam)(emphasis in original). In determining whether an exclusion of evidence violated a criminal defendant's right to confront an adverse witness, habeas courts ask whether "(1) the excluded evidence was relevant; (2) there were other legitimate interests outweighing the defendant's interest in presenting the evidence; and (3) the exclusion of evidence left the jury with sufficient information to assess the credibility of the witness." *United States v. Beardslee*, 197 F.3d 378, 383 (9th Cir. 1999). Even if a court determines that a constitutional error occurred, the petition can only be granted if the reviewing court also finds that the error was not harmless. *Van Arsdall*, 475 U.S. at 684 (Confrontation Clause violation subject to harmless error analysis).

On cross-exam, defense counsel asked S.Q. about the five instances in which she allegedly lied. S.Q. admitted that she had lied to Robin, her foster mother,

about stealing at school. (Doc. 16-11 at 619:15-17). S.Q. admitted she lied to Robin about getting in trouble for bullying on the school bus. (*Id*. at 619:18-21.) S.Q. denied lying to Robin about using a profanity at school. (*Id*. at 620:1-3.) S.Q. denied lying when she claimed Kyle, her foster father, had smacked her and spanked her little sister. (*Id*. at 620:5-7.) Finally, S.Q. denied lying about downloading Instagram. (*Id*. at 620:8-10.)

Robin was asked generally about S.Q.'s character for truthfulness and, indirectly, testified regarding two of the instances in which S.Q. had denied she lied- about her foster father spanking her little sister, Q.Q., and downloading Instagram. Robin testified that S.Q. downloaded an app onto her tablet without permission and, as a result, she had her tablet taken away. (Doc. 16-11 at 1671-72.) Robin stated S.Q. kept getting into trouble while she was placed in Robin's home. (*Id*. at 1673.) Robin also testified that there was an allegation that Kyle had spanked Q.Q., which was not true, the inference being that this allegation was made by S.Q. and that she had been untruthful. As a result of this incident, the foster parents jointly put a plan into place so that Kyle was never alone with S.Q. (*Id*. at 1681.) Robin also testified that she completed a family assessment report and in relation to S.Q.'s honesty, she scored S.Q. as a "1," meaning that she was infrequently honest. (*Id*. at 1683.) Robin also scored S.Q. as a "2" in the "lying" category, meaning that lying "frequently occur[ed]" with S.Q. (*Id*. at 1684.) In a

subsequent assessment, Robin again gave S.Q. a "1" for honesty and a "2" for lying. (*Id.* at 1686.) Accordingly, the only instance of the five of S.Q. purportedly lying that was unaddressed was the allegation that she lied about using profanity at school. This allegation, even if true, has limited relevance to the incest charge.

Additionally, despite being prevented from delving into the specific instances of S.Q. lying, the jury was provided sufficient information to assess S.Q.'s character for truthfulness and untruthfulness. A review of the trial record indicates that at least twelve people provided their opinion as to whether or not they believed S.Q. to have a truthful character, either on cross-examination or direct examination.[2] The opinions regarding S.Q.'s truthfulness ranged from that she was generally truthful, to that she told age-appropriate untruths, to that she lied frequently and had a poor character for truthfulness. Of course, the jury also observed the testimony of S.Q., which spanned several hours of the trial. Upon

---

[2] These individuals were: Ashlen Anderson (Doc. 16-11 at 904: 4-13)(S.Q. is truthful, but has told untruths); Allen Fulton (*id.* at 1201-03)(the investigating officer; he did not believe S.Q. to be lying about the sexual assaults and she did not appear to be untruthful); Pam Colombik (*id.* at 1263, 1264; 1278-79)(had counseled S.Q. about being truthful; would verify that certain events had happened with S.Q.'s foster parents); Shena Rose (*id.* at 1360-61; 1363)(in preparing family assessment she acquired information that S.Q. would not lie, but also noted S.Q.'s brother informed her S.Q. would lie); Theresa William (*id.* at 1448-49)("like any other kid" she will tell lies); Austin Quinlan (*id.* at 1489)(S.Q. brother testified that she lied a lot); Lucy Corbett (*id.* at 1521)(has not had a problem with S.Q. lying. Believed S.Q. has lied, but in an age-appropriate manner); Dara Deines (*id.* at 1592-94)(believes S.Q. to be generally truthful); Shanda Anderson (*id.* at 1605-06)(S.Q. lied once); Heather Quinlan (*id.* at 1651-52; 1664)(not good character for truthfulness- lies a lot and has been caught in many lies); Robin Wolf (id. at 1683-84;1686)(S.Q. was infrequently honest and frequently lied); and, Justin Quinlan (*id.* at 1731)(tells lies more than she tells the truth).

21

review, this Court agrees with the assessment of the Montana Supreme Court that

the cross-examination of S.Q. was extensive. Additionally, Quinlan testified in his

own defense.

Because there was no physical evidence of sexual abuse, this case came

down, in large part, to an assessment of credibility between S.Q. and Quinlan. It is

well settled that determining the credibility of witnesses, resolving evidentiary

conflicts, and drawing reasonable inferences from proven facts are functions within

the exclusive province of the jury. *Bruce v. Terhune*, 376 F. 3d 950, 957 (9th Cir.

2004)(per curiam); *see also United States v. Rojas*, 554 F. 2d 938, 943 (1977). The

Court finds the jury had ample evidence with which to assess witness credibility,

thus, there was no confrontation clause violation. The Montana Supreme Court

reasonably denied this claim; accordingly, their decision must be afforded

deference. *See* 28 U.S.C. § 2254.

## III.    Certificate of Appealability

"The district court must issue of deny a certificate of appealability when it

enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2254

Proceedings. A COA should issue as to those claims on which the petitioner

makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. §

2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the

district court's resolution of [the] constitutional claims" or "conclude the issues

22

presented are adequate to deserve encouragement to proceed further." *Gonzales v. Thaler*, 565 U.S. 134, 140 (2012)(*quoting Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

"[A] claim can be debatable even though every jurist of reason might agree, after a COA has been granted and the case has received full consideration, that the petitioner will not prevail." *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003).  The outcome of Quinlan's remaining two claims is not reasonably debatable; thus a COA will not issue.

Based on the foregoing, the Court enters the following:

## ORDER

1.      Quinlan's Motion for Reconsideration (Doc. 19) is DENIED.

2.      Quinlan's remaining claims, Claim 1 & Claim 2, are DENIED.

3.      The Clerk of Court is directed to enter judgment, by separate document, in favor of Respondents and against Petitioner.

4.      A COA is DENIED.

DATED this *31st* day of March, 2023.

Susan P. Watters
United States District Court Judge